UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 2011-133 (WOB-JGW)

CHARLIE JEAN LILLY,                                          PLAINTIFF

VS.                MEMORANDUM OPINION AND ORDER

CITY OF ERLANGER, ET. AL.
                                                             DEFENDANT

_____

This is an action by Charlie Jean Lilly under Section 1983 for violation of her federal constitutional rights by unlawful arrest, unlawful detainment, and a due process violation, and state law claims including, false imprisonment, assault, battery, malicious abuse of process, malicious prosecution, negligence/gross negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, and defamation.

This matter is before the Court on Defendants' motion for summary judgment. (Doc. 52). The Court heard oral argument on December 9, 2013. Aaron Esmailzadeh represented the Plaintiff, and Jeffrey Mando represented the Defendants. Official court reporter Joan Averdick recorded the proceedings.

Having heard oral argument on this motion, the Court

now issues the following Memorandum Opinion and Order.

## I. FACTS

On July 9, 2010, Charlie Jean Lilly (aka Leslie Sullivan Wood) ("Plaintiff"), drove back to Cincinnati from Louisville and southern Indiana, where she was visiting with her family and boyfriend. (Doc. 50 p. 185). She arrived home between 10:00 a.m. and noon. (*Id.* at 192). Plaintiff was scheduled to work at the University of Cincinnati Hospital that evening and she wanted to take a nap before her shift, so she took a prescribed Ambien. (Doc 36-6 p. 86; Doc. 50 p. 188, 190)[1]. Plaintiff still could not sleep, so she went out on the balcony and did some yoga stretches. (Doc. 50 p. 207). Plaintiff did not remember locking the backdoor after completing her yoga routine. (Doc 36-6 p. 91).

She then got in the shower, and less than 5 minutes later she had a bad feeling and got out to take a peek around, but did not see anything unusual. (Doc. 36-6 p. 92). Within two minutes, she saw a shadow and was hit in the back of the head with something hard, she spun around, grabbed the shower curtain, was hit in the face, then she "totally put all" of her "body weight on the shower

---

[1] Doc. 36-6 is the transcript of Detective Klare's recorded interview with Plaintiff, while Doc. 50 is part II of Plaintiff's deposition.

2

curtain," and then she blacked out. (*Id.* at 92-93).

She awoke with a bag over her head, a rag in her mouth, and she said it felt like somebody was giving her "a pap smear." (*Id.* at 93). She said she then felt insertion of a penis, she moved, and the attacker punched her in the face. (*Id.*) Because of the bag over her head and because he attacked her from behind, she was unable to identify the attacker. (Doc. 36-3 p. 10). But she said he was short, that he did not weigh much, that he smelled like body odor, was wearing a ski mask, that he "had to have been a white man because the way he spoke to me it sounded like something my father would say," and that "his penis was small." (Doc. 36-6 p. 92-97). Before fleeing, the attacker told her that if she took the bag off her head, he would kill her, so she waited no more than fifteen minutes before she called 911. (*Id.* at 96).[2]

Plaintiff said she had left her phone under her pillow to use as an alarm clock to wake her up for work. (*Id.* at 98). At approximately 3:37 p.m., Plaintiff called Erlanger's 911 Dispatch Center. (Doc. 36-2 EPD 3). Plaintiff identified herself as Leslie Wood, reporting that she was attacked in her apartment, tied to her bed, and

---

[2] In Plaintiff's deposition she stated it was closer to an hour than a few minutes before she dialed 911. (Doc. 50 p. 245).

raped.  (Doc. 36-3 p. 2, 6-7).

Officers responded, including: Lt. Kevin Gilpin, Detective Kim Klare, Officer Jill Stulz, Officer Matt Kremer, Sgt. Douglas Eagler, Lt. Anthony Wilson, and Captain Michael Jansing.  (Doc. 36-2 EPD 3).  Sgt. Eagler and Officers Kremer and Stulz were the first to arrive at the scene.  (*Id.*)  Sgt. Eagler and Officer Stulz attempted to enter through the front door but it was locked.  (Doc. 55 p. 25-27; Doc. 54 p. 18).  Officer Kremer, after climbing onto the second story balcony, found its door locked, and, after obtaining permission, kicked in the door.  (Doc. 36-4 at Kremer Lapel Video 00:00 to 00:43).  He then let Sgt. Eagler and Officer Stulz in through the front door.  (*Id.*)

The police officers found Plaintiff tied to her bed with red bed sheets, a plastic bag was over her head, and she was holding her cell phone.  (Doc. 36-4 01:15 to 01:23).  The officers cleared the rest of the apartment and did not find anyone.  (*Id.* at 01:24 to 01:54).

Officer Kremer took pictures of the scene, and Sgt. Eagler ordered Officer Stulz to monitor ingress and egress to the crime scene.  (Doc. 55 pp. 40, 46; Doc. 54 p. 23).  This concluded the role of Officer Kremer and Stulz in the investigation.  (Doc. 52 pp. 51-53; Doc 54 pp. 24-26). Lt.

4

Wilson, Capt. Jansing, and Sgt. Eagler left the scene and played no further role in the investigation. (Doc. 51 pp. 24-27; Doc. 53 pp. 27-31; Doc. 55 pp. 50, 54-57).

Detective Klare followed Plaintiff to the hospital, to ensure evidence was properly collected and to interview her. (Doc. 56 p. 64-65). Lt. Gilpin, the head of Erlanger's detectives, discussed the case with Detective Klare. (Doc. 56 pp. 101-102).

While at Plaintiff's apartment, several officers noted inconsistencies between Plaintiff's account of the attack and the scene. First, Plaintiff's account was that the bathroom was where a violent struggle took place. Plaintiff alleged that the unknown assailant hit her in the back of the head with a glass blender, that she turned, grabbed the shower curtain and put all her weight on it, was hit again, but this time in the face, and then she blacked out. (Doc. 36-3 p. 6; Doc. 36-6 pp. 92-93). She awoke tied to the bed, so the unknown assailant must have moved her to the living room and tied her to the bed. (Doc. 36-6 p. 93).

But the photos of the bathroom, and the footage from Officer Kremer's lapel camera, show the bathroom to be neatly organized, with a towel folded over the bathtub, another towel folded on the ground, and nothing was

5

disturbed or knocked over. (Doc. 36-8; Doc. 36-4 Kremer Video 3:22 to 4:10; Doc. 57 pp. 48-50). Gilpin said "it looked like someone had grabbed the shower curtain and gave it one yank" because the shower curtain was partially pulled down, with some of the plastic rings pulled off. (Doc. 57 p. 45). But he also noted nothing else in the bathroom was disturbed. (*Id.* at pp. 45, 50-51). In addition, Gilpin checked if anything was wet in the bathroom by taking some bathroom tissue and wiping the walls and showerhead. (Doc. 57 pp. 48-51). He found the walls and showerhead were dry, including the bathroom floor, but the floor of the bathtub was wet. (*Id.*) Further, the sheets around Plaintiff were also found to be dry at the scene. (Doc. 36-3 EPD 25).

Second, officers noted that the restraints tied to Plaintiff were not very tight and that Plaintiff could have freed herself with little effort. (Doc. 36-7; Doc. 36-4 Kremer Video 5:34; Doc. 55 pp. 42-44; Doc. 57 pp. 38-41). Klare noted that Plaintiff could have tied herself up. (Doc. 36-2 EPD 24). Further, Plaintiff told the 911 operator that she had a plastic bag over her head, the 911 operator asked "Are you not able to take it off?" and Plaintiff responded, "I can barely take it off. Really, I can—I only got motion in my left—in my left arm." (Doc.

36-3 p. 6). Some officers also noted she could easily remove the plastic bag from her head with her left arm because she was holding the phone to her ear. (Doc. 57 pp. 40-41; Doc. 52 p. 26). However, when Kremer arrived on scene, Plaintiff still had the plastic bag on her head. (Doc. 36-4 1:15-1:19).

There were other inconsistencies in the call to the 911 operator and the later account of the attack by Plaintiff. Plaintiff told the 911 operator she tried to defend herself with a plastic fork, but she told Klare in an interview later that day that she grabbed the shower curtain and then was knocked unconscious. (Doc. 36-3 p. 14-15; Doc. 36-6 p. 93). An undamaged plastic fork can be seen in a basket underneath a washcloth in the bathroom, next to the bathtub. (Doc. 36-8).

Plaintiff described her alleged assailant to the 911 operator as "just a little taller than me" but described him to Klare later the same day as "a small man."[3] (Doc. 36-3 p. 29; Doc. 36-6 p. 93). At an interview on July 22, 2010, Plaintiff described the alleged assailant as having a "lanky build" and between 5'8" to 5'10" tall. (Doc. 36-2 EPD 21). Klare noted that Plaintiff began to get nervous

---

[3] The Plaintiff is 5'4" according to police documents. (Doc. 36-11).

and then terminated the July 22 interview early, citing concerns for her stepfather. (*Id.* at EPD 22).

On August 3, 2010, Klare contacted Plaintiff to set a date to finish the prior interview. (Doc. 36-2 EPD 22). Plaintiff told Klare during the phone call that she had legally changed her name to "Charlie Jean Lilly" for anonymity purposes. (*Id.*) After some back and forth phone calls, on August 5, 2010, Plaintiff and Klare decided to complete the interview on August 13, 2010. On August 10, 2010, Plaintiff contacted Klare, stating again she changed her name for anonymity purposes. (*Id.* at EPD 23-24). On August 12, 2010, Klare met with attorney Amy Burke; they searched "COURTNET" and found Plaintiff was granted a name change on June 30, 2010 and entered on July 2, 2010, over a week before the attack. (*Id.* at 26). Klare then drafted an arrest warrant which was signed by Kenton County District Judge Kenneth Easterling. (*Id.*)

Plaintiff canceled the August 13, 2010 interview, which was rescheduled to August 16, 2010, which Plaintiff also canceled. (*Id.* at 26-27). On August 18, 2010, Gilpin and Detective Miles[4] followed Plaintiff from her work in Ohio, into Kentucky, where Officer Stevens[5] was waiting.

---

[4] He is not a defendant.
[5] He is not a defendant.

(*Id.* at 27-28).  Officer Stevens stopped and arrested Plaintiff.  (*Id.* at 27-28).

## II. Analysis

### A. Legal Standards

#### 1. Probable Cause

"This Court repeatedly has explained that 'probable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). "Probable cause is defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'"  *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)).  There are many variations on the definition of probable cause but "[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt."  *Harris*, 513 F.3d at 511; *Brinegar v. United States*, 338 U.S. 160, 175 (1949).

Probable cause "consider[s] only the information possessed by the arresting officer at the time of the

arrest." *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008) (citation omitted). The court is to look at the "totality of the circumstances" to determine if an arrest is supported by probable cause. *Id.* "This totality of the circumstances analysis includes a realistic assessment of the situation from a law enforcement officer's perspective." *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (quoting *United States v. Barrett,* 890 F.2d 855, 861 (6th Cir. 1989)). "Whether probable cause exists is determined under a reasonableness standard based on all the facts and circumstances within the officer's knowledge at the time of the arrest or seizure." *Baker v. Snyder*, No. 1:05-CV-152, 2006 WL 2645163, at *9 (E.D. Tenn. 2006) (citing *Thacker v. City of Columbus,* 328 F.3d 244, 255 (6th Cir.2003)). Further, "[o]nce probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused." *Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir. 1999).

### 2. Qualified Immunity

"Qualified immunity shields government officials from liability for civil damages insofar as their conduct does not violate clearly established [] constitutional rights of which a reasonable person would have known." *Williams v.*

10

*Port Huron Sch. Dist.*, 455 F. App'x 612, 618 (6th Cir. 2012) (citations and internal quotations omitted). It is the Plaintiff's burden to show the Defendants are not entitled to qualified immunity. *Sheets v. Mullins,* 287 F.3d 581, 586 (6th Cir. 2002) ("The ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity.") (citation omitted).

"[T]he right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The unlawfulness must be apparent in light of pre-existing law at the time of the violation. *Id.*

"We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials . . . should not be held personally liable." *Anderson*, 483 U.S. at 641. Further, "police officers applying for warrants are immune if a reasonable officer could have believed that there was probable cause to support the application." *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987) (citing

*Malley v. Briggs*, 475 U.S. 335, 344-45 (1985)).

**B. Application of the Probable Cause and Qualified Immunity Legal Standards**

**1. Remaining Claims After Concessions**

The Plaintiff concedes claims against several Defendants. Claims against the "unknown officers," Matthew Kremer, Douglas Eagler, Michael Jansing, Jill Stulz and Anthony Wilson have been conceded by the Plaintiff because she failed to respond to Defendants' motion for summary judgment as to those defendants.[6]

In addition Plaintiff appears to concede her Section 1983 claims against the City of Erlanger.[7] Plaintiff also fails to dispute Erlanger Police Department's status as *sui juris* thus conceding all of her claims against Erlanger Police Department.

This leaves federal and state claims against Defendants Gilpin and Klare in both their official and individual capacities, as well as state law claims against

---

[6] Plaintiff also conceded these claims during oral argument.
[7] During oral argument, Plaintiff's counsel seemed to indicate Plaintiff did not concede her municipal liability claim. However, the claim fails because Plaintiff failed to adduce any evidence of an official policy, practice, or custom of the municipality that caused Plaintiff's Constitutional rights to be violated. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Further, *respondeat superior* is not applicable to § 1983 claims against a municipality. *Id.*

the City of Erlanger.

**2. Probable Cause and Qualified Immunity**

Klare and Gilpin may have had probable cause to charge Plaintiff with falsely reporting an incident in violation of KRS 518.040.[8] There is no question that Plaintiff reported an incident that was within law enforcement's official concern. Whether Plaintiff's story is true or false is not at issue. The only issue here is whether there was sufficient evidence that created probable cause to arrest Plaintiff. The undisputed facts were at least sufficient for a reasonable officer in Defendants' position to believe there was probable cause.

Defendant Klare stated in her affidavit requesting an arrest warrant that she took statements from the Plaintiff, reviewed the lapel cameras from the responding officers, that Plaintiff lied about the reasons for changing her name, that multiple inconsistencies were found, that she conducted a full investigation, and that it was clear

---

[8] KRS 519.040(b),(c) and (d) state: "A person is guilty of falsely reporting an incident when he: (b) Reports to law enforcement authorities an offense or incident within their official concern knowing that it did not occur, (c) Furnishes law enforcement authorities with information allegedly relating to an offense or incident within their official concern when he knows he has no information relating to such offense or incident; or (d) Knowingly gives false information to any law enforcement officer with intent to implicate another . . . ."

13

Plaintiff fabricated the rape story. (Doc. 36-10 EPD 94).

The most salient facts regarding probable cause are the discrepancies between the Plaintiff's account of what occurred and the physical condition of Plaintiff's apartment. First, Plaintiff said the alleged attack occurred while she was taking a shower, that she was hit in the back of the head with the blender pitcher, that she grabbed the shower curtain and put all her weight on it, that she was hit in the face with the blender, and she became unconscious. She awoke on the bed tied down.

The bathroom's condition, when the officers responded, contradicted such a violent encounter. The shower curtain was slightly ripped at the top and there was water on the floor of the tub. Other than that, however, nothing was out of place. There was a towel neatly folded on the edge of the tub and another on the floor next to it, a shower caddy hung on the towel rack undisturbed, nothing was knocked over, the shower walls were dry, the showerhead itself was dry, the bathroom floor was dry, and the bed was dry.

In addition, officers at the scene noted that some of the restraints that Plaintiff was tied with were loose and that she easily could have freed herself. Plaintiff also made inconsistent statements about how her hands were tied,

14

and how they got loose for her to make the phone call. Also, when the officers arrived, Plaintiff still had the plastic bag over her head, even though she told the 911 dispatcher she could take it off.

Further, Plaintiff initially stated the alleged assailant was small, not much bigger than her and that she could tell because he did not feel heavy, while later she stated he was tall and lanky, between 5'8" and 5'10", which is significantly taller than Plaintiff.

In addition, Plaintiff also made several strange comments during the investigation. She said the rape initially felt like getting a "pap smear" and that the alleged rapist was not "very endowed." When Plaintiff was asked if the attacker ejaculated she replied, "He did not have a happy ending." When describing the rape, Plaintiff said it was not "one of those storybook rapes that you hear about" and that the alleged rapist "just wanted to play with his toy and he did not—he did not like me ever to move or giggle or—nobody was giggling, okay?"

Further, Klare had difficulty setting up interviews with Plaintiff. Plaintiff terminated one interview early, citing concerns about her stepfather's health. Plaintiff also failed to cooperate in obtaining a semen sample from her boyfriend, whom she admitted to having sexual contact

with earlier in the day the alleged rape occurred.

Plaintiff bears the burden of proof to show Defendants are not entitled to qualified immunity.  *Sheets*, 287 F.3d at 586.  Plaintiff argues that probable cause fails because Defendant Klare made a material misstatement and because she omitted various facts in her application for an arrest warrant.  The Court, however, need not reach this question because, even if probable cause does not exist, the facts were sufficient that a reasonable officer, in the Defendant officers' position, would not know he was violating Plaintiff's clearly established constitutional rights.

Given the numerous inconsistencies in the Plaintiff's account of the alleged rape, the difficulty in conducting further interviews with Plaintiff, Plaintiff's odd statements during the investigation, and the discrepancies between the physical scene and Plaintiff's account, Klare had a reasonable belief that Plaintiff fabricated the incident.  This is enough that a reasonable officer could have believed probable cause existed to obtain an arrest warrant, even if that belief was mistaken.  Therefore, Defendants did not violate a clearly established constitutional right.  Thus, the Defendants' are entitled to qualified immunity for the section 1983 claims, and those claims are dismissed with prejudice.

**3. Supplemental Jurisdiction**

The Court, in its sole discretion, declines to exercise its supplemental jurisdiction over the remaining state law claims and dismisses them without prejudice. 28 U.S.C. 1367.

Therefore, having heard oral argument and reviewed this matter, and the Court being otherwise sufficiently advised,

**IT IS ORDERED** (1) that the Defendants' motion for summary judgment (Doc. 36) be, and is hereby, **GRANTED AS TO PLAINTIFF'S FEDERAL CLAIMS** and (2) Plaintiff's state law claims be, and are hereby, **DISMISSED WITHOUT PREJUDICE**.

This 18th day of December, 2013.



Signed By:
William O. Bertelsman
United States District Judge

TIC: 37 Min.